J-A24018-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| PETER CIAMPA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| CONVERSION SCIENCES, INC., ANNANCE CONSULTING, INC., MARY K. HAMM AND VINCENT CILIBERTI | |
| APPEAL OF: CONVERSION SCIENCES, INC., ANNANCE CONSULTING, INC., AND MARY K. HAMM | No. 2752 EDA 2014 |

Appeal from the Order Entered July 2, 2014
In the Court of Common Pleas of Delaware County
Civil Division at No.: 99-10057

| | |
|---|---|
| PETER CIAMPA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| CONVERSION SCIENCES, INC., ANNANCE CONSULTING, INC., MARY K. HAMM AND VINCENT CILIBERTI | |
| APPEAL OF: CONVERSION SCIENCES, INC., ANNANCE CONSULTING, INC., AND MARY K. HAMM | No. 2771 EDA 2014 |

Appeal from the Judgment Entered on December 11, 2014
In the Court of Common Pleas of Delaware County
Civil Division at No.: 99-10057

| | |
|---|---|
| PETER CIAMPA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| CONVERSION SCIENCES, INC., ANNANCE CONSULTING, INC., MARY K. HAMM AND VINCENT CILIBERTI | |

J-A24018-15

APPEAL OF: CONVERSION SCIENCES,
INC., ANNANCE CONSULTING, INC., AND
MARY K. HAMM

No. 2778 EDA 2014

Appeal from the Judgment Entered on December 11, 2014
In the Court of Common Pleas of Delaware County
Civil Division at No.: 99-10057

BEFORE:  PANELLA, J., WECHT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED DECEMBER 08, 2015**

In this tortuous, sixteen-year-old case, Conversion Sciences, Inc. ("CSI"), Annance Consulting, Inc. ("Annance"), and Mary K. Hamm (collectively, "Appellants") appeal the trial court's December 11, 2014 judgment entered in favor of Peter Ciampa.[1]  Principally, Appellants contest the trial court's bench verdict in favor of Ciampa on his claims for breach of fiduciary duty, usurpation of corporate opportunities, and intentional interference with contractual relations.  Appellants also appeal the trial court's appointment of a receiver and order for an accounting.  Appellants further contest the trial court's order requiring them to pay pre-judgment interest on the verdict.  Finally, Appellants appeal the trial court's July 2, 2014 order finding them in contempt, directing that they pay attorney's fees, and reallocating the costs of the court-appointed receiver in favor of Ciampa. We affirm.

_____

[*]     Retired Senior Judge assigned to the Superior Court.

[1]     This Court consolidated these appeals *sua sponte* on February 19, 2015.  Vincent Ciliberti has not participated in this appeal.

- 2 -

The trial court has furnished an admirably detailed factual and procedural history in this case with detailed citations to the certified record. *See* Trial Court Opinion ("T.C.O."), 2/19/2015, at 1-53. Although we will reproduce a lengthy excerpt of the trial court's factual history, we will attempt to minimize our review of the procedural history to just what is required to review Appellant's issues. The trial court's account follows:

> This fifteen[-]year[-]old action involves allegations of breach of fiduciary duty, usurpation of corporate opportunities, and intentional interference with contractual relations brought by [Ciampa] against [Appellants] as result of the creation and the eventual demise of [Appellant] CSI and the subsequent creation of [Appellant] Annance.
>
> In 1994, Ciampa, an SAP consultant for Ernst and Young, met with [Hamm], an owner and operator of several businesses that supplied contractors in the computer and technical[-]related fields, and Defendant Vincent Ciliberti on several occasions and discussed the development of a software program that performed data conversion and the creation of a corporation to pursue this endeavor and related consulting services. Hamm and Ciliberti were married.
>
> As a result of these discussions, Ciampa, Hamm, and Ciliberti agreed to establish a corporation to work in the area of SAP consulting. SAP is a German software company that engineers R/3 software.[2] On February 23, 1995, CSI was incorporated with Ciampa, Hamm, and Ciliberti as its shareholders. Ciampa was a 50% shareholder, and Ciampa was an officer and director of CSI until his resignation by letter dated December 30, 1998. Ciampa was an employee of CSI until his resignation by letter dated November 5, 1997. Hamm and Ciliberti were each 25% shareholders[] and were officers and directors of CSI. In

_____

2   R/3 software is a "business software package designed to integrate all areas of business." *See* What is SAP, www.saponlinetutorials.com/what-is-sap-erp-system-definition/ (last reviewed November 23, 2015).

consideration for their respective ownership interests in CSI, Hamm and Ciliberti provided the funding for CSI; and Ciampa contributed the intellectual capital for CSI, Proteus, a software program.

Ciampa developed the idea of Proteus, "an innovative software tool that is employed in prototyping, configuration, data conversion and implementation of legacy data to R/3 data" that significantly reduces the time and expense of conversions. Data migration or conversion is the act of extracting data out of an existing system and reformatting that data to make it suitable for a target environment.

On June 16, 1995, Ciampa assigned all rights, title, and interest that he had in Proteus to Windemere Enterprises, Inc. ["Windemere"], a corporation wholly owned by Hamm. Immediately thereafter, [Windemere] transferred the rights to Proteus to CSI. Hamm presented the documentation to Ciampa regarding the transfer of the copyright of Proteus. Hamm and Ciliberti told Ciampa that the transfer needed to be done to protect the parties. On June 29, 1995, CSI filed a registration statement for the copyright of Proteus.

Regarding compensation, Hamm and Ciampa agreed that no one would be paid as an employee unless the person worked on a full-time schedule; and Ciampa, as a part-time employee, would receive payment against CSI's future earnings once CSI secured a customer. At this time Ciampa continued to work at his full-time job at Ernst and Young as a SAP consultant but subsequently quit. As a full-time employee, Ciampa received advances from CSI; and Hamm and Ciliberti accrued receivables from CSI as a result of the advances made to Ciampa. Initially, Ciampa received $40,000.00 per advance annually that was eventually increased to $65,000.00.

Ciampa was never compensated for the creation of Proteus. Ciampa worked on the development of Proteus in 1994, and supervised the programmer working on the development of Proteus. Upon development completion, CSI licensed Proteus to customers as a data conversional tool usable for versions of SAP's R/3 software.

Ciampa's primary duties at CSI included the following: managing the data conversion projects, supervising the project consultants, acting as a liaison with the project management

staff, consulting in data migration at the customer sites, attending sales calls, and planning new business acquisitions. Hamm's primary responsibilities as Chief Operating Officer and President of CSI included sales, marketing, accounting, and management services for CSI; and Ciliberti's primary responsibilities involved operational services but did not include day-to-day involvement in CSI's activities. . . .  Hamm and Ciliberti did not work at CSI on a full time basis . . . .

CSI offered and provided to its customers the following services or combination thereof: (1) the implementation of Proteus, the data conversion software; (2) consulting services for the customer's data conversion project; and (3) the licensing of Proteus.  In 1996, CSI began to significantly increase its business through the signing of customers, including Elf Atochem and Brother International.  In 1997, CSI had five or six active customers[,] had doubled its gross revenue stream and employed three or four programmers and three to five consultants.

In the summer of 1997, the relationship between Hamm, Ciliberti, and Ciampa began to deteriorate.  At the June 25, 1997 Board of Directors [m]eeting, Ciampa and Hamm had a disagreement regarding the proposal for Ciampa's compensation.  Hamm proposed that Ciampa would receive an increase in his advance against CSI's receivables.  Ciampa no longer wanted to receive an advance against CSI's future earnings but wanted to be a salaried employee.  This issue over Ciampa's compensation was never resolved.

In September 1997, Hamm informed Ciampa that CSI was no longer a viable enterprise because CSI's existing customers were leaving and the pipeline of potential customers had dried up.  In addition, Hamm told Ciampa that she would no longer devote her time, effort, or money to CSI; that she wished to put her efforts into her other company, Linden International, Inc. ["Linden"]; and that CSI was a waste of her time.  Ciampa disputed . . . Hamm's claim regarding CSI's viability.  Ciampa testified that Hamm informed him that she intended to start a new consulting company and that she never intended for CSI to be only a consulting company.  Hamm testified, to the contrary, that CSI was never a consulting business but was only a product vendor.  However, in the Year One Projection for CSI, Hamm estimated that CSI's first-year income would be $1,359,375.00 from consulting services (90%) and $150,000.00 (10%) from

licensing services.  Hamm told Ciampa that he could work for the new consulting company, if there was a place for him.

As a result of this conversation, Ciampa resigned his position as an employee of CSI on November 5, 1997 and maintained little or no contact with Hamm and Ciliberti.  When Ciampa attempted to visit CSI's offices, he was informed to leave or the police would be called.  At the November 27, 1997 Board of Directors [m]eeting, Ciampa, unbeknownst to him, was voted off of the Board of Directors for CSI.

In December 1997, Hamm decided to form [Annance].  Hamm began to plan the creation of Annance in August 1997.  On December 9, 1997, Annance was incorporated with Hamm, Ciliberti, and Paul Drucker, Esquire, counsel to CSI and Annance, as its shareholders, officers, and directors . . . .  In its Articles of Incorporation, Annance's principal activities are the development and licensing of computer software and related information services.  In addition, Annance provided consulting services to its customers.  Hamm and Ciliberti did not inform Ciampa about their intentions regarding the creation of Annance.  Prior to the formation of Annance, Hamm did not offer through a letter or her counsel to inform Ciampa's attorney offering an ownership interest in Annance to Ciampa [*sic*].

In January 1998, CSI and Annance entered into an agreement that authorized Annance to license Proteus to its customers.  Pursuant to this Agreement, CSI received a $5,000.00 [per] month licensing fee from Annance for its use of Proteus.  Ciampa did not know about the [licensing] of Proteus or the migration of CSI employees to Annance.  Hamm, on CSI's behalf, and Ciliberti, on Annance's behalf, executed the licensing agreement.

Annance used Proteus to complete work for its customers[,] and[,] therefore[,] had the ability to compete with CSI.  As of January 1998, Annance had no . . . product other than Proteus to market.  Annance engaged in the same business as CSI, and advertised itself as a consulting service provider for data

migration and ERP[3] projects. CSI's advertising and Annance's advertising are essentially identical.

After its creation, the remaining five CSI employees that performed data migration and software services were working for Annance. Ciampa testified that if the work that was done by Annance had been offered to CSI, then CSI had the ability to complete the task. . . . CSI had the ability to perform all of the work performed by Annance.

The offices for CSI and Annance were both located at 530 Swedesburg Road in Wayne, Pennsylvania. Spencer Beecher and Robert Gon[s]ales, former employees of CSI and Annance, both testified that Annance provided data consulting/migration and consulting services for its customers. Hamm released Beecher from his non-compete agreement with CSI, in order to take employment with Annance, but did not release Gon[s]ales from his non-compete agreement with CSI.

* * * *

Ciampa resigned as a director and officer of CSI on December 30, 1998.[4] Hamm testified that at all relevant times, CSI had retained earnings; and that there were no Board of Directors' or Shareholders' [m]eeting[s] regarding CSI's retained earnings. CSI's Board of Directors accepted Ciampa's resignation [in] January 1999. In 2000, CSI's shareholders did not receive any distributions, but Hamm and Ciliberti received excessive salaries.

After his departure from CSI, Ciampa created his own company, CCP Consulting, Inc. ["CCP"], and sought work as an independent contractor performing technical consulting on SAP data conversion projects. Ciampa testified that . . . he used the same skills in his work at CSI, [and] Ciampa performed these services for Random House and Betz Dearborne, but that such

---

[3]  ERP refers to "enterprise resource planning." *See* What is SAP, www.saponlinetutorials.com/what-is-sap-erp-system-definition/ (last reviewed November 23, 2015).

[4]  As noted above, the trial court found that Ciampa in fact had been voted off the board *in absentia* on November 27, 1997. The distinction is immaterial to our review.

services could not be performed by CSI as a result of the nature of the work. . . .

At trial, Elliot Roth, [Ciampa's] forensic accounting and business valuation expert, testified that he reviewed CSI's and Annance's financial statements and tax returns and the pleadings in this matter. Upon review, Roth calculated Ciampa's damages through a normalized income analysis. This analysis is used by reviewing historical financial statements and making adjustments to the statements by removing unusual or abnormal items. Based upon his analysis, Roth concluded that Annance obtained business opportunities that rightfully belonged to CSI; and therefore, Ciampa, as a 50% shareholder in CSI, was entitled to a 50% share. In his expert opinion, Roth determined that Ciampa sustained damages in the amount of $3,143,000.00, representing 50% of the earnings that CSI should have received. Roth's analysis indicated that in 1997, Annance had no business, but in 1998 and 1999, its business increased.

Roth further opined that in 2000, Annance's business and its profits began to decline, and in 2001 and 2002, Annance sustained substantial decreases in profits. Based upon his review of Annance's financial statements after 2000 and CSI's financial statements prior to 2000, Roth estimated a normalized income statement for Annance in 2000. Roth assumed business would not grow or decline after 2000; took the normalized income for 2000; and used that number for the years 2001 and 2002. Roth opined that CSI's total earnings would be $6,286,000.00; and therefore, Ciampa was entitled to 50% of CSI's total earnings.

T.C.O. at 1-9 (record citations omitted).

Procedurally, Ciampa commenced this lawsuit by filing a complaint on

August 2, 1999.[5] This was followed by Ciampa's amended complaint, in

_____

[5] A far more detailed account of the lengthy post-trial procedural history of this case than will be provided here may be found in the trial court's opinion. **See** T.C.O. at 9-52.

- 8 -

which Ciampa asserted claims for breach of fiduciary duty; usurpation of corporate opportunities; unjust enrichment and *quantum meruit*; intentional interference with contractual relations; fraud; and civil conspiracy against CSI, Annance, Hamm, and Ciliberti. A three-day bench trial followed in February 2003, after which the trial court entered a verdict in favor of Ciampa on all claims except fraud and civil conspiracy. The trial court also denied Ciampa's claim for punitive damages. By order entered on January 15, 2004, the court appointed Richard Volpe, CPA, to serve as a receiver for CSI and Annance and to conduct an accounting to accurately assess the damages.[6]

It was then that these proceedings screeched to a near halt. First, Appellants filed a notice of appeal. This Court quashed that appeal, and our Supreme Court eventually denied review of this Court's quashal. While the appeal was pending, Volpe provided his report to the trial court, which Ciampa contended was deficient. In March of 2006, Ciampa filed a motion to compel the production of documents by Appellants to enable him to analyze Volpe's report.

---

[6]     Specifically, the trial court directed Volpe to determine CSI's and Annance's legal obligations from October 1, 1997, to the present; to assess each company's income and expenses for the same period; to collect each company's receivables and satisfy each company's obligations; and to determine each company's net income from October 1, 1997, to the present. Order, 1/15/2004, at 1-3.

On May 4, 2006, the trial court entered judgment upon the verdict. Therein, the trial court awarded Ciampa 50% of Annance's net income, which included various items, but added up to one half of over $2 million. Ciampa then filed a post-trial motion, which the trial court granted in an August 22, 2006 order, vacating the prior judgment. In that order, the trial court appointed Peter R. Barsz, CPA, as receiver for CSI and Annance,[7] and directed him to complete the tasks set forth in the court's earlier January 15, 2004 order. Appellants appealed the trial court's order, this Court quashed the appeal, and, on September 17, 2008, our Supreme Court denied Appellants' petition for allowance of appeal.

On January 23, 2009, the trial court directed Barsz to resume his duties as court-appointed receiver and to continue his work toward fulfilling the dictates of the trial court's January 15, 2004 order. On February 17, 2010, the trial court ordered a contempt hearing to address whether Appellants had violated five different orders spanning December 23, 2003, to October 7, 2009, pertaining to the production of documents to Barsz. At the February 24, 2010 hearing, Appellants informed the trial court that they had given Barsz additional documents.

What followed was more of the same. The trial court authorized Barsz to retain John J. Pund, CPA, a forensic accountant. On December 15, 2010,

---

[7] It is not clear from the record why Volpe was replaced by Barsz as receiver.

Pund submitted an initial report. At a July 8, 2011 hearing, the parties discussed, *inter alia*, "Pund's identification of open issues, reasonable business expenses and distributions, and Barsz/Pund's request for documentation from [Appellants]." ***Id.*** at 13. On August 2, 2011, the trial court ordered the parties to meet for the purpose of addressing the open items identified during the hearing.

In February 2012, Ciampa filed a petition to adjudicate Appellants in contempt. However, at the hearing, which occurred nearly nine months later, the parties indicated that they had reached an agreement to continue the hearing and seek clarification from the court regarding the scope of the ordered production.

On May 8, 2013, the trial court held a hearing to address the standing allegations of contempt as well as the payment of Barsz's and Pund's fees; according to Ciampa, the accountants would not complete their report until they were paid. Ciampa asked to be relieved from paying a full 50% of the fees in question because Appellants had failed to comply with prior production orders. At that hearing, Barsz testified at length regarding his difficulties obtaining production from Appellants. He further testified that he did not believe Ciampa should be responsible for a full share of his fees because the expenses were associated with duplicative activities necessitated by Appellants' continued intransigence. He noted in particular that, since his 2006 appointment, he had yet to receive control of CSI's or Annance's accounts or checkbooks. The parties ultimately agreed that

Ciampa would pay approximately one third of the outstanding fees, with Appellants making up the difference.

On June 15, 2013, Pund issued a report, and the trial court convened a hearing on June 17, 2013 to address the information contained therein. Barsz and Pund both testified at length regarding the documentation that they had received, what they had not received, and how they endeavored to fill in the gaps in the information they required to make a full assessment. *See id.* at 15-20.

On July 19, 2013, the trial court held another hearing at which the parties reviewed the documents provided by Appellants. Barsz submitted an inventory of the documents that he and Pund had received and Appellants introduced a spreadsheet identifying the documents that they had handed over. Pund identified a number of relevant documents that he had not received from Appellants. The trial court directed the parties to meet at Pund's office to compile an updated inventory.

On October 2, 2013, the trial court reconvened to address Ciampa's motions to reallocate the receiver's costs, to hold Appellants in contempt, and to exclude certain documents that were cited in the report of Colleen Vallen, CPA, Appellants' forensic accounting expert. At this hearing, Pund testified at length regarding the ongoing, largely ineffectual process of trying to secure additional documents from Appellants, an account rife with nominal agreements that ultimately were not fulfilled, occasional instances where Appellants provided some documents, and frequent and voluminous

- 12 -

correspondence amongst Pund, Appellants, and Appellants' accountant, Ralph E. Bleakley, CPA, seeking to fill various gaps and resolve pending disputes. At the same hearing, Pund further testified regarding how he utilized the documents at his disposal to reach his conclusions regarding the numbers relevant to the businesses' finances. Pund opined that there was no ambiguity or misunderstanding between him and the parties regarding what documents he sought, which Appellant produced tardily if at all. At the same hearing, the court also took the testimony of Vallen, whom Appellants had retained to review and opine on Pund's report. Bleakley also testified at the October 2, 2013 hearing. He discussed the interrelationship of several business entities, including CSI, Annance, and Windemere/Linden.[8] ***See id.*** at 22-28.

On March 17, 2014, the trial court held yet another hearing to discuss Ciampa's outstanding motions. At this hearing, Hamm testified regarding various aspects of the defendant corporations' accounting practices, which also involved corporate transfers of large sums to Windemere/Linden, which she owned. With regard to the documents sought by Barsz and Pund, Hamm indicated that some were located in an automated electronic system in Philadelphia and others were stored as hard copies in Florida. Hamm

---

[8] Although it appears from the record that Windemere and Linden are discrete entities, the trial court refers to them in tandem, and Appellants do not suggest that this is problematic in the context of this case. Accordingly, we employ the same convention.

disputed Pund's assertion that the nature and scope of the outstanding document requests were clear. Hamm also disputed some of Pund's findings, including his determination that $871,000 transferred to Hamm from Annance was compensation rather than a shareholder distribution. She averred that Annance's payroll was paid from Windemere/Linden.

Barsz then testified that, since December 2010, he had "made numerous efforts to get documents from [Appellants] to enable Pund to complete his analysis and issue his [r]eport." *Id.* at 33. He also discussed the issue of corporate transfers to Windemere/Linden totaling $1.8 million and their relevance to his analysis. He further testified regarding various items he had requested over the years that Appellants had not furnished.

Pund testified that the categories of documents he required were those relevant to the salaries of the officers and the corporate distributions to shareholders. He, too, testified at some length regarding his difficulties obtaining the information he needed to complete his analysis, in particular documentation enabling him to assess the propriety of the $1.8 million in cash transfers from Annance to Windemere/Linden. Pund testified at length regarding other categories of expenses and compensation and items related thereto as to which he lacked sufficient information to integrate into his calculations. Notably, Pund declined to opine on whether the compensation paid to Hamm by Annance was a reasonable and legitimate expense, a determination essential to identifying net income, deferring that assessment to the trial court. *Id.* at 34-41.

Pund's testimony continued the next day, when he detailed at length several years of telephone conversations, electronic correspondence, and other communications amongst him, Barsz, the trial court, and the parties and their agents, all in furtherance of completing the financial picture to enable completion of his final report. He also addressed Vallen's report, noting that aspects of that report were based upon information that he had requested but not received from Appellants. He further opined that "Vallen's primary analysis was 'an attempt without receipt, without expense report to recreate some basis for the expenses that had been taken.'" *Id.* at 44 (quoting Notes of Testimony ("N.T."), 3/18/2014, at 49).

Vallen then testified, disputing many of Pund's conclusions. In particular, rather than deferring to the trial court, like Pund, she opined that Hamm's compensation was "a reasonable salary expense," and thus should be excluded from net income. *Id.* at 48 (quoting N.T., 3/18/2014, at 138-42). She further disputed Pund's determinations as to what constituted compensation and what was a shareholder distribution.

After taking this and a great deal more evidence, the trial court entered judgment on June 19, 2014. The court's full order read as follows:

1.    Judgment is entered in favor of Ciampa and against Appellants on Counts I, II, IV, V, VI and VII.[9]

_____

[9]    Respectively, breach of fiduciary duty, *quantum meruit*, unjust enrichment, intentional interference with contractual relations, usurpation of corporate opportunity, and breach of fiduciary duty.
*(Footnote Continued Next Page)*

- 15 -

2.    Judgment is entered in favor of Appellants and against Ciampa on Counts III, VIII, IX and X.[10]

3.    As to Ciampa's Motion for Contempt, it is hereby ORDERED and DECREED that Appellants have willfully refused to comply with the trial court's orders dated December 23, 2003, August 21, 2006, April 24, 2007, January 23, 2009, October 7, 2009, March 4, 2010, and August 2, 2011, by withholding documents and information required [by Barsz] and his retained consultants, said motion is GRANTED.

4.    As to Ciampa's Motion for Reallocation for the Costs of the Court-Appointed Receiver and the Receiver's Forensic Accountant, it is hereby ORDERED and DECREED that Appellants shall pay all fees and costs from August 15, 2011, until March 17, 2014.

* * * *

6.    The trial court finds in favor of Ciampa and against Appellants in the following amounts:

a. Net income allocation at 50 percent: **$830,169.00 through 2009.**

b. For amounts paid to Hamm and Ciliberti: **$635,864.00.**

i.    Total amount of wages paid to Hamm by Windermere/Linden: $1,818,184.00 divided by ½ which is allocated to Annance: $909,092.  Half of $909,092.00 payable to Ciampa: **$454,546.00.**

ii.    Total amount of wages paid to Ciliberti by Windermere/Linden: $584,231.00 [½ of] which is allocated to Annance: $292,116.00.    Half of $292,116.00 payable to Ciampa: **$146,058.**

iii.    For amounts paid to Hamm by CSI: $58,331.00.  Half of $58,331 payable to Ciampa: **$29,166.00.**

_(Footnote Continued)_ _____

[10]    Respectively, fraud, conspiracy to usurp corporate opportunity, conspiracy to commit fraud, and conspiracy to interfere with contractual relations.

      iv.    For amounts paid to Ciliberti by CSI: $12,188.00. Half of $12,188.00 payable to Ciampa: **$6,094.00.**

c. Total excess of the dividends over the net income is $494,952.00 half of is $247,476.00 payable to Ciampa: **$247,476.00.**

d. Transfers of cash from Annance: Half of $743,000.00 payable to Ciampa: **$371,500.00**

e. Hamm's automobile: Half of $40,569.00 payable to Ciampa: **$20,285.00.**

f. Reimbursed expenses: Half of $182,895.00 payable to Ciampa: **$91,498.00.**

g. Maki's[11] travel expenses: Half of $85,000 payable to Ciampa: **$42,500.00.**

h. Legal fees: Half of $124,500.00 payable to Ciampa: **$62,350.00.**

7.    **Total amount of damages to be awarded to Ciampa: $1,301,542.00.**[12]

8.    Appellants shall pay Ciampa post-judgment interest at the lawful rate.

9.    Appellants shall pay Ciampa's attorney['s] fees from August 15, 2011 until March 17, 2014.

*Id.* at 50-51 (minor modifications for clarity).

On June 26, 2014, the trial court held another hearing to determine the amounts due Ciampa in pre-judgment interest, legal fees and costs, and the reallocation of Barsz and Pund's fees and expenses. On July 2, 2014,

---

11    Janet Maki, Hamm's sister, was employed by Annance.

12    This number, which is related by the trial court in its opinion, is in error. In fact, the sum of the enumerated damage items is $2,301,642.00.

the trial court amended its June 19, 2014 order by adjusting (*i.e.*, correcting) the amount of damages to reflect the corrected sum of $2,301,642, ordering Appellants to pay an additional $621,416.34 in pre-judgment interest for the years 2010 to 2014, and ordering Appellants to pay post-judgment interest at the legal rate. Also on July 2, 2014, in response to Ciampa's motion for contempt, the trial court directed Appellants to pay Ciampa $76,055.99 to compensate him for legal fees and costs incurred between August 15, 2011 and March 17, 2014, and reallocated $43,322.37 in costs and fees associated with Barsz and Pund's work between those dates.

On July 11, 2014, Appellants filed motions for reconsideration of the contempt and reallocation orders and post-trial motions. On August 25, 2014, the trial court heard argument on Appellants' motions, and denied them by order entered on September 2, 2014.

Appellants filed the three notices of appeal underlying this consolidated appeal on September 22, 2014. Two of them were directed to the trial court's entry of judgment, and the third challenged the trial court's July 2, 2014 order finding Appellants in contempt and the concomitant award of attorneys' fees and reallocation of the court-appointed receiver's fees and costs. On September 23, 2014, the trial court entered three separate orders directing Appellants to file concise statements of the errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On October 8, 2014, Appellants timely complied.

This Court initially quashed Appellants' appeals *sua sponte* because final judgment, including the above assessments of prejudgment interest, fees and costs, had not been entered below. On December 11, 2014, the trial court entered final judgment. On February 10, 2014, at Appellants' request, the three appeals were reinstated. This Court consolidated the appeals for purposes of decision on February 19, 2015. On the same day, the trial court entered a unitary opinion pursuant to Pa.R.A.P. 1925(a) addressing the subject matter of all three appeals. This case now is ripe for decision.

Before this Court, Appellants raise the following issues:

A. Did the trial court err in finding that Annance and CSI were in the same line of business and that Hamm's participation in Annance constituted a usurpation of CSI's corporate opportunities?

B. Did the trial court err in failing to find that Ciampa's own pursuit of business opportunities while still an officer of CSI is a bar to recovery under the doctrine of unclean hands when the undisputed evidence shows that the activities in which he engaged were the same as those of Annance, on which Ciampa's claims were based?

C. Did the trial court err in finding that Ciampa satisfied his burden of proof to support his claims for intentional interference with prospective or existing contractual relations?

D. Did the trial court err in finding unjust enrichment and *quantum meruit* on the erroneous premise that the Proteus software remained the intellectual property of Ciampa even after he assigned his rights in that software to CSI in exchange for a fifty-percent ownership interest in CSI?

E. Did the trial court err in awarding net profits, and in particular fifty percent, of Annance as a measure of damages despite Ciampa's failure to prove the specific damages related to

the loss of the corporate opportunities allegedly usurped by Hamm?

F.    Did the trial court abuse its discretion by awarding an accounting and appointing a receiver even though Ciampa failed to specifically identify business wrongfully diverted to Annance or the amount of the resulting damages when such information, which was necessary to meeting his burden of proof at trial, was available through pre-trial discovery?

G.    Was there sufficient evidence to support the trial court's calculation of the damages award?

H.    Did the trial court abuse its discretion in finding Appellants in contempt and awarding counsel fees?

I.    Did the trial court abuse its discretion in reallocating the fees of the court-appointed receiver and forensic accountant?

J.    Did the trial court abuse its discretion in awarding Ciampa pre-judgment interest?

Brief for Appellants at 7-8 (minor modifications for clarity).  Grouping certain items together for ease of analysis, we primarily address these issues in the order in which they are presented.

In issues A through D, Appellants seek an entry of judgment in their favor or the grant of a new trial.  We may reverse a trial court's denial of a motion to enter judgment in a party's favor only when "the trial court abused its discretion or committed an error of law that controlled the outcome of the case." *Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 569 (Pa. Super. 2006).  The same standard governs our review of a motion for a new trial.  *Id.* at 576.

> A new trial will be granted on the grounds that the verdict is against the weight of the evidence where the verdict is so contrary to the evidence that it shocks one's sense of justice.  An

- 20 -

appellant is not entitled to a new trial where the evidence is conflicting and the finder of fact could have decided either way.

*Id.* (quoting *Ty-Button Tie, Inc., v. Kincel & Co., Ltd.*, 814 A.2d 685, 692 (Pa. Super. 2002)).

**A.    The trial court did not err in finding that Hamm's participation in Annance constituted a usurpation of CSI's corporate opportunities.**

The corporate opportunity doctrine sounds in equity, and has been described by our Supreme Court as follows:

> The controlling principles of equity are well[-]settled.  Officers and directors of a corporation are deemed to stand in a fiduciary relation to the corporation.  Business Corporation Law, 15 P.S. § 1408.[13]
>
> Mr. Justice (later Chief Justice) Horace Stern ably summarized the burdens imposed because of this statutory fiduciary relation particularly with regard to corporate opportunities when he said:
>
> > '* * * (Officers and directors) must devote themselves to the corporate affairs with a view to promote the common interests and not their own, and they cannot, either directly or indirectly, utilize their position to obtain any personal profit or advantage other than that enjoyed also by their fellow shareholders.  *Bird Coal & Iron Co. v. Humes*, 27 A. 750, 752 (Pa. 1893); *Porter v. Healy*, 91 A. 428, 431 (Pa. 1914).  In short, there is demanded of the officer or director of a corporation that he furnish to it

---

[13]    Section 1408 has been repealed and replaced.  Section 1712 of title 15 of Pennsylvania's consolidated statutes assigns to directors of a corporation a fiduciary relationship to that entity.  An officer is not expressly identified as a fiduciary in section 1712, but is tasked with "perform[ing] his duties as an officer in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances."  15 Pa.C.S. § 1712(c).

> his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself; if he does so, the corporation may elect to claim all of the benefits of the transaction. Nor is it material that his dealings may not have caused a loss or been harmful to the corporation; the test of his liability is whether he has unjustly gained enrichment. **Bailey v. Jacobs**, 189 A. 320, 324 (Pa. 1937).'

> **Lutherland, Inc. v. Dahlen**, 53 A.2d 143, 147 (Pa. 1947); **accord Higgins v. Shenango Pottery Co.**, 279 F.2d 46 (3d Cir. 1960); **Gamlen Chem. Co. v. Gamlen**, 79 F.Supp. 622 (W.D. Pa. 1948); **Rivoli Theatre Co. v. Allison**, 152 A.2d 449 (Pa. 1959); **Weissman v. A. Weissman, Inc.**, 114 A.2d 797 (Pa. 1955); **Howell v. McCoskey**, 99 A.2d 610 (Pa. 1953); **see also Guth v. Loft**, 5 A.2d 503 (Del. Ch. 1939); **see generally** Fletcher, Cyclopedia Corporations § 861.1 (rev. ed. 1965); Sell, Pennsylvania Business Corporations § 408.4 (1969); Note, *Corporate Opportunity*, 74 Harv. L. Rev. 765 (1961).

**Seaboard Indus., Inc. v. Monaco**, 276 A.2d 305, 308-09 (Pa. 1971) (citations modified; footnote omitted).

Principally at issue is Appellants' contention that CSI was only a product vendor, focusing upon licensing Proteus for use by clients, while Annance was conceived predominantly as a consulting company, which, although it licensed Proteus for use by certain clients, offered a broader array of services outside the domain of CSI's business. However, the trial court found that the record supported application of the corporate opportunity doctrine because the evidence "clearly illustrated that Hamm usurped CSI's corporate opportunities and that CSI and Annance were in the same business." T.C.O. at 58-59.

In support of its conclusion, the trial court noted Ciampa's testimony that, while in CSI's employ, he managed three to five consultants and the testimony of Ciampa, Hamm, and Ciliberti to the effect that their work with CSI would include SAP consulting in tandem with Proteus. Ciampa also introduced evidence that "Annance's business purposes included the development and licensing [of] computer software and related information services." *Id.* at 59. Among other considerations, the trial court noted that an overwhelming share of CSI's first-year revenues were associated with consulting, not product licensing. *Id.* at 5 (citing N.T., 2/24/2003, at 105) ("[I]n the Year One Projection for CSI, Hamm estimated that CSI's first-year income would be $1,359,375.00 from consulting services (90%) and $150,000.00 (10%) from licensing services.").

The trial court also rejected Appellants' reliance upon the fact that Annance paid CSI a $5,000 per month licensing fee for the use of Proteus:

> Without the license, Annance would not have been able to use the Proteus software and CSI could have performed such work and solely received benefits from such work. With Annance having the Proteus software license, only [Appellants] received the benefit of all of the consulting and conversion fees. Hamm did not devote her full efforts to CSI and improperly devoted those efforts into diverting CSI's business opportunities to Annance, a competing business which she owned.

*Id.* at 59. Ciampa was the only CSI director unaware that Annance had obtained a license to use Proteus. Further, Annance hired five CSI employees to perform data migration and software work similar to the work that they performed for CSI, including Beecher and Gonsales. Hamm

- 23 -

expressly released Beecher from his non-compete agreement with CSI, although she did not do the same for Gonsales.  *See id.* at 7-8.

As Appellants themselves observe, "[w]hether a business opportunity is a 'corporate' opportunity is a question of fact to be determined from the circumstances existing at the time when it arose."  Brief for Appellants at 26 (quoting *CST, Inc., v. Mark*, 520 A.2d 469, 471 (Pa. Super. 1987)).  Their dispute regarding the trial court's determination is couched in terms of whether the record supported the trial court's finding that Annance availed itself of CSI's corporate opportunities.  In support of their argument, they proceed on two fronts.

First, they argue that Annance and CSI were not in the same line of business.  Appellants maintain that CSI was fundamentally a product vendor, which offered consulting services only in connection with its licensing of Proteus.  They cite Ciampa's own testimony that "[t]he software was the central point of that company."  *Id.* at 28 (citing N.T., 2/24/2003, at 177).  Gonsales, a former CSI employee later turned Annance employee, testified to similar effect.

Annance, conversely, offered a broader suite of consulting services, and was "formed to be a service business rather than a product business."  *Id.* at 29.  CSI employees who "migrated" to Annance required additional training to perform work for Annance in using SAP software in payroll

applications. *Id.* (citing N.T., 2/24/2003, at 92).[14] Annance was not restricted to mere data conversion, but also performed project management and developed relationships with vendors of products other than Proteus, whose products Annance would utilize for the benefit of its clients. Although Annance, too, performed data migration projects like CSI, and did so using Proteus software, it was not limited in the products it could use, as CSI ostensibly was. In light of this testimony and evidence, Appellants contend that the trial court "[i]gnor[ed] competent evidence" and employed an overbroad definition of "consulting." *Id.* at 30.

Appellants' account of the evidence, while not inaccurate, is incomplete. For example, during trial, Ciampa was asked to review Annance's articles of incorporation and read certain sections thereof. Specifically, he read Annance's stated purpose, which was identified as "[a]ll lawful business for which corporation may be incorporated under the BCL including developing and licensing computer software and other information[-]related services." N.T., 2/24/2003, at 61-62. He further testified that this was the same activity identified in CSI's articles of incorporation. *Id.* at 62. Furthermore, by Hamm's admission, Annance used Proteus to complete work for its clients, clearly reflecting at least one

_____

[14] Notably, Mr. Gonsales later testified that, if he had received that training while employed with CSI, CSI could have performed the same work. N.T., 2/24/2003, at 95.

dimension in which Annance could compete with CSI. *See* T.C.O. at 7. Annance also advertised itself almost identically to CSI, specifically identifying itself as a "consulting service provider for data migration and ERP projects." *Id.* Five of CSI's data migration and software employees moved to Annance. Furthermore, Ciampa testified that CSI could have done all of the work that Annance performed. *Id.*

Second, Appellants contend that CSI was unable to avail itself of the opportunities when they arose. Principally, Appellants point to Ciampa's attempts to sever ties from CSI in the wake of Hamm's indication that she would no longer seek to nurture and grow CSI, and Ciampa's focus upon another venture, CCP, in the wake of her decision. They also contend that CSI was ill-prepared to avail itself of the opportunities claimed by Annance. Brief for Appellants at 31-33.

This argument is unavailing. The evidence supported the trial court's determination that CSI's enfeeblement, and the consequent difficulties it would have faced endeavoring to take on the opportunities in question, was precipitated first and foremost by Hamm's decision to effectively abandon CSI, which precipitated Ciampa's departure to pursue other opportunities. *See* T.C.O. at 5-6 (finding that Hamm conceived Annance in August 1997 and told Ciampa that CSI was no longer viable and that she would no longer devote time, effort, or money to CSI in September 1997, prompting Ciampa's resignation from CSI as an employee in November 1997). It is brazen indeed for Hamm to argue that she cannot be held liable for

opportunities lost by a corporation, when the circumstances hampering that company's abilities were predominantly, if not exclusively, caused by her abandonment of that corporation to dedicate her efforts to Annance, which utilized Proteus and five former CSI employees to perform work similar to that performed by CSI for various clients who might otherwise have retained CSI. Because the evidentiary record provided ample support for the trial court's determination that Hamm's decision to neglect CSI preceded and engendered Ciampa's abandonment, we will not substitute our judgment for that of the trial court on that point.

While we recognize that the testimony suggests that there were certain distinctions between some of the work that Annance performed and CSI's primary business, Appellants cite no case law suggesting that two entities' enterprises must be coextensive in all particulars to activate corporate opportunity protections. Such a rigid definition would open the door to profligate abuses by unscrupulous businesspeople. Furthermore, the trial court received testimony strongly suggesting that the distinctions between the corporations, such as they were, were relatively superficial, a conclusion reinforced by the migration *en masse* of CSI employees to Annance and the testimony that Annance licensed Proteus specifically to perform work for two thirds of its clients that was indistinguishable from the work that CSI had performed for its clients. This evidentiary basis supported the trial court's finding that Hamm diverted potential CSI opportunities to Annance in furtherance of her own interests and detrimentally to Ciampa's.

Thus, the trial court did not abuse its discretion in determining that Appellants improperly usurped CSI's corporate opportunities.

> **B.    The trial court did not err in failing to find that Ciampa's own pursuit of business opportunities while still an officer of CSI is a bar to recovery under the doctrine of unclean hands.**

As a principle of recovery sounding in equity, the corporate opportunity doctrine is offset by the doctrine of unclean hands.

> The doctrine of unclean hands is derived from the unwillingness of a court to give relief to a suitor who has conducted himself so as to offend the moral sensibilities of the judge, and the doctrine has nothing to do with the rights and liabilities of the parties. *In re Estate of Pedrick,* 482 A.2d 215, 222 (Pa. 1984).  This maxim is far more than a mere banality.  It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with iniquity or bad faith relative to the matter in which he seeks relief.  This doctrine is rooted in the historical concept of a court of equity as a vehicle for affirmatively enforcing the requirement of conscience and good faith.  Thus, while equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. *See id.* (citing *Shapiro v. Shapiro,* 204 A.2d 266, 268 (Pa. 1964) (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814-15 (1945))).

*Lucey v. W.C.A.B. (Vy-Cal Plastics PMA Grp.)*, 732 A.2d 1201, 1204-05 (Pa. 1999) (citations modified).

> The application of the doctrine to deny relief is within the discretion of the [trial court], and in exercising [its] discretion the [trial court] is free not to apply the doctrine if a consideration of the entire record convinces [it] that an inequitable result will be reached by applying it.

*In re Bosley*, 26 A.3d 1104, 1114 (Pa. Super. 2011) (quoting *Stauffer v. Stauffer*, 351 A.2d 236, 245 (Pa. 1976)). In sum, we must defer to the trial court's assessment of what is equitable, given that the question is whether the circumstances of the case and the conduct alleged to have dirtied the hands of the complainant offend the court's "moral sensibilities."

At the heart of Appellants' argument lie Ciampa's activities with CCP after his resignation from employment with CSI. Doing business as CCP, Ciampa undertook consulting projects involving data migration for two clients who could have retained CSI for the same work. Appellants thus contend that Ciampa is not free of the stain of the very same actions upon which his lawsuit against Appellants is based. Appellants also argue that Ciampa's unclean hands arose generally from his abandonment of CSI.

The trial court first found that this issue was waived. *See* T.C.O. at 58. Specifically, the court observed that Appellants did not contend that Ciampa had usurped CSI's business opportunities in their pleadings or pre-trial statement. Rather, that issue—which lies at the heart of Appellants' unclean hands defense—first was raised in Appellants' post-trial motion.

The trial court's finding is not supported by the record.[15] Appellants raised in new matter a generalized defense of unclean hands. Appellants'

---

[15]     Had the trial court not erred in its review of the record, it would have had a sound basis for deeming this issue waived. Pennsylvania Rule of Civil Procedure 1030 provides, with exceptions inapplicable to this case, as follows:

*(Footnote Continued Next Page)*

Answer to Ciampa's First Amended Complaint, 7/6/2000, at 16, ¶153 ("[Appellants'] claims are barred by the doctrine of unclean hands and *in pari delicto*."). Furthermore, in their pretrial statement, Appellants dedicated an entire subsection of their argument to the proposition that "Ciampa's Claim Is Barred by His Unclean Hands and Own Usurpation of Corporate Opportunities." Appellants' Pretrial Proposed Findings of Fact and Conclusions of Law, 6/27/2003, at 23-25, ¶¶144-53. That being said, they based their argument only upon Ciampa's alleged usurpation of CSI's corporate opportunities, not the broader issue of his resignation from, and effective abandonment of, CSI. Accordingly, only the former argument is preserved for our review.

_____

*(Footnote Continued)* ——————————

> [A]ll affirmative defenses including but not limited to the defenses of accord and satisfaction, arbitration and award, consent, discharge in bankruptcy, duress, estoppel, failure of consideration, fair comment, fraud, illegality, immunity from suit, impossibility of performance, justification, laches, license, payment, privilege, release, *res judicata*, statute of frauds, statute of limitations, truth and waiver shall be pleaded in a responsive pleading under the heading "New Matter[."]

Pa.R.C.P. 1030. Pennsylvania Rule of Civil Procedure 1032(a) provides that "[a] party waives all defenses and objections which are not presented either by preliminary objection, answer or reply, except a defense which is not required to be pleaded under Rule 1030(b)." Thus, in **Commonwealth v. Coward**, 414 A.2d 91 (Pa. 1980), our Supreme Court held that the appellant waived the affirmative defense of unclean hands by failing to raise it as new matter in his answer to the complaint. **Id.** at 99.

Turning to the merits of the preserved issue, the trial court found as follows:

> [Appellants] argue that from November 1997 to December 1998, Ciampa, while a CSI officer, engaged in data projects for Random House and Betz Dearborn. At trial, Ciampa testified that[,] although he performed work at both companies, he was not in competition with CSI. Ciampa further testified that the work he performed for Random House could not have been performed by CSI because a placement firm listed the work and CSI did not use placement firms to obtain work. Ciampa further testified that during a CSI Board of Directors' meeting, Hamm rejected the use of placement firms to obtain work. As the finder of fact, the [t]rial [c]ourt found Ciampa's testimony to be credible; and therefore, [Appellants'] assertion that the [t]rial [c]ourt ignored evidence of unclean hands by Ciampa is without merit.

T.C.O. at 58 (citations omitted).

As noted, *supra*, we will disturb a trial court's conclusion regarding the defense of unclean hands only for an abuse of discretion. Furthermore, the trial court may reject an unclean hands defense when it does not offend the court's moral sensibilities or under circumstances that the court finds it would be inequitable to do so. Perhaps the evidence would have supported the trial court in finding that Ciampa had unclean hands. However, we do not find that the evidence compelled such a finding. Rather, the evidence afforded the trial court reason to conclude that it would be inequitable to accept the unclean hands defense when Ciampa's departure from CSI was triggered by Hamm's abandonment of CSI for Annance. This is especially so in light of the trial court's acceptance of Ciampa's testimony that Hamm had always insisted that CSI eschew work obtained through placement services,

- 31 -

which would have prevented CSI from obtaining the business that Ciampa secured for CCP. Consequently, we find no abuse of discretion in the trial court's rejection of Appellants' unclean hands defense.

**C. Did the trial court err in finding that Ciampa satisfied his burden of proof to support his claims for intentional interference with prospective or existing contractual relations?**

With respect to intentional interference with existing contractual relations, the following standard applies:

> Pennsylvania law follows the Restatement (Second) of Torts § 766's standard for intentional interference with contractual relations:
>
>> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.
>
> *Id.*; *see Daniel Adams Assocs., Inc., v. Rimbach Pub., Inc.*, 519 A.2d 997, 1000 (Pa. Super. 1987).
>
>> Essential to a right of recovery under this section is the existence of a contractual relationship between the plaintiff and a "third person" other than the defendant. By definition, this tort necessarily involves three parties. The tortfeasor is one who intentionally and improperly interferes with a contract between the plaintiff and a third person.
>
> *Daniel Adams Assocs.*, 519 A.2d at 1000.

*Sears, Roebuck & Co. v. 69th St. Retail Mall, L.P.*, 2015 PA Super 208, at *16 (Oct. 2, 2015) (citations modified).

The Restatement also governs claims for intentional interference with prospective contractual relations:

> Our Supreme Court has adopted Restatement (Second) of Torts § 766B to adjudicate such claims. ***See Glenn v. Point Park College***, 272 A.2d 895, 897 (Pa. 1971). Section 766B provides:
>
>> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>>
>>> (a)    inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>>>
>>> (b)    preventing the other from acquiring or continuing the prospective relation.
>
> Restatement (Second) of Torts § 766B (1979); ***see Behrend v. Bell Tel. Co.,*** 363 A.2d 1152, 1158–59 (Pa. Super. 1976), *vacated on other grounds,* 374 A.2d 536 (Pa. 1977). The commentary to § 766B indicates that such a claim may find its basis in "any prospective contractual relation," including ". . . any . . . relations leading to potentially profitable contracts." Restatement (Second) of Torts § 766B, cmt. c. With regard to intentionality, § 766B cross-references § 8A, which provides: "Intent is not . . . limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." ***Id.*** § 8A, cmt. b.
>
> In order to state a claim of tortious interference with prospective contractual relationship upon which relief may be granted, a plaintiff has the burden of pleading and proving:
>
>> 1) a prospective contractual relation;
>>
>> 2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;
>>
>> 3) the absence of privilege or justification on the part of the defendant; and

> 4) the occasioning of actual damage resulting from the defendant's conduct.
>
> ***Thompson Coal Co. v. Pike Coal Co.****,* 412 A.2d 466, 471 (Pa. 1979) (citing ***Glenn****,* 272 A.2d at 898-99). The plaintiff also must plead and prove "a reasonable likelihood or probability that the anticipated business relationship will be consummated." ***Behrend****,* 363 A.2d at 1159.

***Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.****,* 40 A.3d 1261, 1274-75 (Pa. Super. 2012) (citations modified; footnote omitted).

Conceding the existence of the relevant contracts and/or prospective contractual relations, Appellants allege that the evidence failed to establish Hamm's intent to interfere and her lack of privilege or justification. Appellants note that the trial court in its opinion failed to identify the specific evidence supporting these elements. Appellants then, somewhat opaquely, contend that the evidence failed to support Ciampa's assertion that Hamm breached her fiduciary duty to CSI, in essence a revisitation of Appellants' usurpation of corporate opportunities argument, which we rejected for the reasons stated, *supra*. Appellants focus upon the proposition that the only possible basis for such an assertion would be that Hamm, acting for CSI, improperly licensed Proteus to Annance, despite doing so at a market rate, and assert that "CSI would have licensed its software to *anybody* so long as it received a fee." Brief for Appellants at 42. They claim that the latter proposition was undisputed, but provide no citation to the record.

Appellants cite no evidence of record to suggest that CSI would be wholly indiscriminate in licensing Proteus. While it might be fair to conclude,

based upon the undisputed evidence, that CSI would license Proteus to any end user, nothing that we have observed in the record suggests that CSI would license Proteus to another firm with knowledge that the firm seeking the license would use Proteus to solicit and serve clients whom CSI was equally capable of serving. Presumably, McDonald's wouldn't release the recipe for the Big Mac's "special sauce" to Burger King at **any** price. The proposition that agents of CSI, acting without conflict in CSI's best business interest, would license Proteus to another firm that sought to use Proteus in competition with CSI, or would do so for the same fee that CSI charged its client end users, is supported neither by the record nor by common sense.

The evidence supported the trial court's conclusions that Hamm, acting on behalf of CSI, licensed Proteus to Annance with knowledge that Annance would utilize Proteus in ways indistinguishable from how CSI used the platform. In so doing, she solicited business opportunities that should have been available to CSI, the entity that she was obligated as a fiduciary to protect. Appellants do not identify, nor can we discern, any privilege or justification that would apply to protect Hamm's actions as against the corporate opportunity doctrine. Accordingly, the trial court did not err or abuse its discretion in determining that Appellants interfered with CSI's actual and/or prospective contractual relations.

**D. The trial court did not err in finding unjust enrichment and *quantum meruit*.**

Appellant challenges the trial court's entry of a verdict in Ciampa's favor for unjust enrichment. The trial court so ruled upon the basis that Appellants derived an improper benefit from Hamm's decision on CSI's behalf to license Proteus to Annance, in which Ciampa had no interest.

Our Court has described the tort of unjust enrichment as follows:

> "Unjust enrichment" is essentially an equitable doctrine. **Styer v. Hugo**, 619 A.2d 347 (Pa. Super. 1993), *aff'd*, 637 A.2d 276 (Pa. 1994). Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred. **Schenck v. K.E. David, Ltd.**, 666 A.2d 327 (Pa. Super. 1995). The elements necessary to prove unjust enrichment are:
>
> > (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.
>
> **Id.** at 328 (citations omitted); **accord Torchia v. Torchia**, 499 A.2d 581, 582 (Pa. Super. 1985) ("To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.'") (citation omitted).

**Mitchell v. Moore**, 729 A.2d 1200, 1203-04 (Pa. Super. 1999) (citations modified; emphasis omitted).

Appellants specifically challenge the proposition that its receipt of the benefits in question under the circumstances at bar was inequitable.

Appellants emphasize that Ciampa was not uncompensated for his Proteus software: To the contrary, he was granted a 50% interest in CSI in consideration for the transfer of his rights to the software to CSI. They note that whenever Annance used the software with a client it paid a $5,000 per month licensing fee, just as CSI's own clients did. Because Ciampa had a 50% ownership interest in CSI, he received his due share of the benefits of that software.[16]

The trial court explained that it based its unjust enrichment verdict upon Hamm's decision on CSI's behalf to license Proteus to Annance for use in the sort of data-migration tasks that were CSI's primary business. Although the licensing of Proteus for a fee was an integral part of CSI's business, and Annance was paying the same licensing fee that CSI clients had paid, the trial court found unjust enrichment in the diversion of business to Annance. The trial court implicitly found that, when Ciampa transferred Proteus to CSI, he did not do so expecting that substantial benefits of doing

---

[16] Appellants attempt to buttress their argument that Ciampa was adequately compensated through licensing fees by averring that their investment in Ciampa's then-nascent software was necessary to its completion and implementation. It is difficult not to read this as an invitation to Ciampa to stop complaining because he got **something** out of the deal. But whether the software was misappropriated is quite distinct from the question whether, through duplicitous business practices and a breach of fiduciary duty, Hamm deprived Ciampa of the full benefit of his bargain, unjustly enriching Appellants in the process.

so would accrue not to CSI but to a new corporation, in which he had no interest, that engaged in direct competition with CSI.

Appellants cite no case law in support of any of their arguments beyond their explication of the governing legal standard. Their entire argument essentially attacks the trial court's weighing of the evidence, and its determination that Ciampa, in fact, was denied the benefit of the bargain that he originally made with Hamm and Ciliberti. However, that there is evidence favorable to Appellants does not conclude the issue.

The trial court's ruling plainly was informed by its conclusion that Hamm diverted CSI's business opportunities to Annance to Ciampa's detriment, insofar as it denied Ciampa the benefit of his 50% interest in CSI, had Hamm honored her fiduciary obligation to that company. That 50% interest being the full measure of his consideration for giving Proteus to CSI, any inequitable reduction in the value of that interest due to Hamm's violation of her fiduciary duty that redounded to Appellants' benefit reasonably could be found to constitute unjust enrichment to the beneficiaries of the business diverted. The trial court so found. Thus, we find no abuse of discretion.

As set forth above, in connection with issues A through D, Appellants seek judgment in their favor or the award of a new trial. Because we detect no errors of law or abuses of discretion on the above-stated grounds in the trial court's entry of judgment in favor of Ciampa, Appellants are not entitled to either.

**E.    The trial court did not err in awarding 50% of Annance's net profits as a measure of damages.**

**G.    There was sufficient evidence to support the trial court's calculation of the damages award.**

Appellants next take issue with aspects of the trial court's approach to calculating damages.   Our standard of review of a trial court's damage calculation is as follows:

> The general rule in this Commonwealth is that the plaintiff bears the burden of proof as to damages.
>
> The determination of damages is a factual question to be decided by the fact-finder.   The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses.
>
> Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages.   The fact-finder may make a just and reasonable estimate of the damage[s] based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

*Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564-65 (Pa. Super. 2004) (quoting *Judge Technical Servs., Inc., v. Clancy*, 813 A.2d 879, 885 (Pa. Super. 2002)).

Appellants argue under issue E that the trial court erred in awarding 50% of Annance's net profits rather than awarding a percentage of the profits derived from specifically identified CSI business opportunities that Appellants diverted to Annance.   *See* Brief for Appellants at 51-52.   They note Ciampa's own testimony to the effect that approximately one third of Annance's consulting agreements were unrelated to "data conversion and

interface work,"[17] and cite this as conclusive evidence that awarding Ciampa a full half-share of all of Annance's profits was excessive. *Id.* at 53.

In their issue G, Appellants briefly develop more specific complaints regarding the damage calculation. They contest the award of 50% of Annance's net income for the reasons set forth above. As well, they challenge the trial court's award of 50% of what they characterize as Annance's "business expenses" and cash transfers to Windemere/Linden.[18] Similarly, Appellants also contend that the trial court erred in incorporating into the damages the compensation that was paid to Hamm and Ciliberti. *See id.* at 59-60.

The gist of these arguments is that, when calculating net profits, it is generally appropriate to deduct reasonable business expenses, including reasonable compensation. Notably, whether the amounts identified as compensation were reasonable was not an uncontested issue. To the

_____

[17] The testimony in question, while spun here to positive effect for Appellants, is not as favorable when viewed in its full context. During the testimony in question, Ciampa was testifying regarding the substance of consulting agreements procured from Annance in discovery. He testified that, of the fifteen executed contracts he reviewed, ten of them, including the first eight or nine Annance signed, referred solely to "data conversion and interface development," work materially identical to that performed by CSI. Until May of 1999, Annance had signed no agreements for work that varied materially from CSI's work. *See* N.T., 2/24/2003, at 137-38.

[18] By and large, these appear to overlap. By Appellants' account, the cash transfers to Windemere/Linden largely or exclusively arose because Hamm opted to manage payroll for Annance through Windemere/Linden, necessitating cash transfers.

contrary, Barsz and Pund both testified and reported on their efforts to obtain information necessary to tie various disbursements and transfers to their specific purposes so that the reasonableness assessment could be performed. They ultimately deferred to the trial court on that assessment as a matter of law outside their purview, but both they and the trial court were hampered by their difficulties obtaining the information that they required to make the relevant determinations. Indeed, these difficulties have much to do with why we are addressing the question of damages in a memorandum written over twelve years after the trial court entered the verdict in Ciampa's favor as to which we are now reviewing damages.

Philosophically, if not doctrinally, we cannot avoid concluding that the trial court's damage award was partially motivated by its determination that Appellants acted with bad faith during the damage-assessment process. The trial court repeatedly castigates Appellants for their intransigence in the provision of materials that the trial court repeatedly ordered them to provide to Barsz and Pund.

In **Commonwealth Trust Co. of Pittsburgh v. Hachmeister Lind Co.**, 181 A. 787 (Pa. 1935), our Supreme Court favorably quoted the following passage of the United States Supreme Court's decision in **Story Parchment Co. v. Paterson Parchment Paper Co.**, 282 U.S. 555 (1931):

> It would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the

damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. . . . [T]he risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party. . . .

* * * *

[T]he precise amount cannot be ascertained by a fixed rule, but must be matter of opinion and probable estimate. And the adoption of any arbitrary rule in such a case, which will relieve the wrongdoer from any part of the damages, and throw the loss upon the injured party, would be little less than legalized robbery.

*Id.* at 563-65; *see Commonwealth Trust*, 181 A. at 790. Clearly, these principles animated the trial court's calculation of damages.

Even if we accept, *arguendo*, that the award to Ciampa of 50% of Annance's net income exceeds the proven damages arising from specific instances in which Annance diverted business to itself that might have been available to CSI, that tells only part of the story. The trial court also found in favor of Ciampa on his unjust enrichment claim. In effect, the trial court found that Hamm used CSI's technology to drive Annance's formation, growth, and success, when, in exercising her fiduciary duty to CSI, she could have brought some or all of Annance's business into CSI. Had she successfully done so, something the trial court could reasonably have concluded was feasible at the time, Ciampa, as a 50% owner of CSI, would have reaped half the benefits of most or all of that business. While that contention may be disputed by Appellants, that does not change the fact

that the record, viewed in tandem with Appellants' own complicity in Barsz's and Pund's difficulties obtaining the sort of information that would enable a more precise determination, provided support for the trial court's conclusion to that effect.

As this Court observed in **Omicron Systems**, "[a]lthough the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data." 860 A.2d at 564-65. It is not enough that the court could have concluded that granting Ciampa fully half of Annance's net income was more than the circumstances warranted; Appellants must establish that the court abused its discretion in doing otherwise. This Appellants have not done. Thus, this argument fails.

**F.    The trial court did not abuse its discretion by awarding an accounting and appointing a receiver.**

An equitable accounting is appropriate where a fiduciary relationship exists between the parties, where fraud or misrepresentation is alleged, or where the accounts in question are mutual and complicated, and the party seeking the accounting does not possess an adequate remedy at law. **A.M. Skier Agency, Inc., v. Gold**, 747 A.2d 936, 942 (Pa. Super. 2000); **cf. Rock v. Pyle**, 720 A.2d 137, 142 (Pa. Super. 1998) ("An equitable accounting is improper where no fiduciary relationship exists between the parties, no fraud or misrepresentation is alleged, the accounts are not

mutual or complicated, or the plaintiff possesses an adequate remedy at law.").

> When the accounts are mutual or complicated **or when discovery is needed and is material to the relief**, equity has jurisdiction to order an accounting.  In this regard, it has been held that an account is sufficiently complicated to enable equity to take hold when a jury would not be qualified to state such an account.

*Pittsburgh's Airport Motel, Inc., v. Airport Asphalt & Excavating Co.*, 469 A.2d 226, 229 (Pa. Super. 1983) (citations, internal quotation marks, and modifications omitted).

Appellants' argument largely depends upon their contention that Ciampa failed to establish the diversion of specific business opportunities. Appellants maintain that the information relevant to that inquiry was available to Ciampa through discovery:   "The information regarding Annance's specific business opportunities and clients was available to Ciampa through discovery.   Failing to [obtain that information] during discovery and trial, Ciampa attempted to satisfy this burden through post-trial discovery couched in the guise of an accounting."  Brief for Appellants at 57.[19]

Appellants' suggestion that relevant evidence to establish damages was readily available during discovery is categorically belied by the tortuous

---

[19]    Thus, Appellants effectively rehash their argument challenging the trial court's verdict on usurpation of corporate opportunity.

saga that ensued in the wake of trial during the accounting process. The court-appointed receiver and his forensic accountant detailed lengthy delays and substantial omissions in the information made available to it during the process of the accounting, making it difficult to imagine how seeking the same information during discovery would have met with more success.

This Court cannot glean from this record any reason to believe that damages fairly could have been fixed during the trial based upon conventional discovery. Even after the trial court entered its verdict and turned its energies to providing a framework for the assessment of damages, Appellants' intransigence and/or incomplete record-keeping precluded a ready calculation of damages. Each expert involved in that task, from Volpe through Vallen, acknowledged gaps in the documents provided by Annance and Windemere/Linden and struggled to substantiate hard and fast conclusions regarding the amounts and natures of various items of compensation and corporate transfers. The only way this task could have been made more complicated and less certain would have been **not** to seek a neutral accounting. This is precisely the sort of case that cries out for such an accounting. Thus, the trial court did not abuse its discretion in directing an accounting.[20]

---

[20] Appellants offer no discrete argument regarding the appointment of a receiver, as such. Thus, to the extent that Appellants intended to assert an

*(Footnote Continued Next Page)*

**H.    The trial did not abuse its discretion in finding Appellants in contempt and awarding counsel fees.**

**I.    The trial court did not abuse its discretion in reallocating the fees of the court-appointed receiver and forensic accountant.**

The court's disparate allocation of the costs associated with the accounting and receivership and the award of counsel fees both hinge upon its finding that Appellants were in contempt of court.  Thus, we address them together, beginning with the legal standards governing each argument.

> [A]ppellate review of a finding of contempt is limited to deciding whether the trial court abused its discretion.  ***McMahon v. McMahon***, 706 A.2d 350, 356 (Pa. Super. 1998); ***see also Sinaiko v. Sinaiko***, 664 A.2d 1005, 1009 (Pa. Super. 1995) (Superior Court review of finding of civil contempt is limited to determining whether the trial court committed a "clear" abuse of discretion).
>
> > Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration.  Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.  Similarly, the trial court abuses its discretion if it does not follow legal procedure.
>
> ***Miller v. Sacred Heart Hosp.***, 753 A.2d 829, 832 (Pa. Super. 2000) (quotations and citations omitted).  This Court must place great reliance on the sound discretion of the trial judge when reviewing an order of contempt. ***Sinaiko***, 664 A.2d at 1009.

---

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

error or abuse of discretion specifically related to the court's appointment of Barsz as receiver, it is waived.  ***See*** Pa.R.A.P. 2119(a).

*Lachat v. Hinchcliffe*, 769 A.2d 481, 487 (Pa. Super. 2001) (citations modified).

Appellants argue that the trial court's order necessarily constituted a finding of criminal contempt rather than civil contempt, and that the proceedings that led to the finding did not provide the heightened due process protections to which an alleged contemnor is entitled when he is accused of criminal contempt. *See generally In re Martorano*, 346 A.2d 22, 27-28 (Pa. 1975).

Appellants failed to preserve this argument. In their post-trial motion challenging the trial court's contempt finding, Appellants contested only the sufficiency of the evidence to support the trial court's determination that they had violated numerous prior orders regarding the production of documents to Barsz and Lund. *See* Memorandum of Law in Support of Appellants' Motion for Post-Trial Relief, 8/20/2014, at 43-46. That argument goes to the soundness of the trial court's review of the evidence. It does not challenge in any way the procedural adequacy of the contempt proceedings relative to the particular contempt found, or to any inconsistency between the trial court's finding of civil contempt and the remedy it imposed upon that finding. Thus, this issue is waived.

Even if the issue were not waived, Appellants' argument would fail. Appellants present the question as one amenable to bright-line distinctions, but the line between civil and criminal contempt is not so clear.

> The determination of whether a particular order contemplates civil or criminal contempt is crucial, as each classification confers different and distinct procedural rights on the defendant. ***Kramer v. Kelly***, 401 A.2d 799, 801 (Pa. Super. 1979). There is nothing inherent to a contemptuous act or refusal to act which classifies the act itself as "criminal" or "civil." ***Diamond v. Diamond***, 715 A.2d 1190, 1194 (Pa. Super. 1998). The distinction between criminal and civil contempt is rather a distinction between two permissible judicial responses to contumacious behavior. ***Id.*** These judicial responses are classified according to the dominant purpose of the court. ***Id.*** If the dominant purpose is to vindicate the dignity and authority of the court and to protect the interest of the general public, it is a proceeding for criminal contempt. ***Knaus v. Knaus***, 127 A.2d 669, 672 (Pa. 1956). But where the act of contempt complained of is the refusal to do or refrain from doing some act ordered or prohibited primarily for the benefit of a private party, proceedings to enforce compliance with the decree of the court are civil in nature. ***Id.*** The purpose of a civil contempt proceeding is remedial. ***Id.*** Judicial sanctions are employed to coerce the defendant into compliance with the court's order, **and in some instances, to compensate the complainant for losses sustained**. ***Id.***

***Lachat***, 769 A.2d at 487-88 (Pa. Super. 2001) (citations modified; emphasis added).

Among the remedies that this Court has recognized as appropriate to civil contempt is the compensation of a complainant for his losses sustained due to the counterparty's non-compliance with a court order. In this case, the sanction imposed upon the trial court's finding of contempt was an award of legal fees to Ciampa associated with what the trial court found to be Appellants' dilatory behavior and a reallocation of Barsz's and Pund's fees for the same reason. In both cases, the court's rulings were designed to relieve Ciampa of the burden of extra expenses associated with Appellants'

- 48 -

non-compliance with trial court orders and lack of cooperation with the court's appointed accountants. Per *Lachat*, such an award, whether for past or ongoing non-compliance, may fall within the range of civil rather than criminal contempt. Thus, even had Appellants preserved this argument before the trial court, they would not be able to establish an abuse of the trial court's discretion under the circumstances of this case.

**J. The trial court did not abuse its discretion in awarding Ciampa pre-judgment interest.**

Finally, Appellants contend that the trial court abused its discretion in imposing pre-judgment interest upon the verdict from 2010 to 2014. We review an award of pre-judgment interest for an abuse of discretion. *Kaiser v. Old Republic Ins. Co.*, 741 A.2d 748, 755 (Pa. Super. 1999). While pre-judgment interest is not a matter of right in equity, as it is in contract disputes, it is available to the trial court as "an equitable remedy awarded to an injured party at the discretion of the trial court." *Id.* (quoting *Somerset Community Hosp. v. Allan By Mitchell & Assocs.*, 685 A.2d 141, 148 (Pa. Super. 1996)). However, discretionary pre-judgment interest is seldom awarded:

> [Pre-judgment] interest is not the rule, but the exception and may be allowed only "as necessary to ensure that in the particular circumstances of the case, the plaintiff has been fully compensated." *Frank B. Bozzo, Inc. v. Electric Weld Div. of Fort Pitt Div. of Spang Indus., Inc.,* 498 A.2d 895, 899 (Pa. Super. 1985).

***Helpin v. Trustees of Univ. of Penna.***, 969 A.2d 601, 620-21 (Pa. Super. 2009), *aff'd*, 10 A.3d 267 (Pa. 2010) (citations modified).

As noted, *supra*, the trial court awarded Ciampa $621,416.34 in pre-judgment interest spanning the years 2010 to 2014. It explained its reasoning for doing so briefly as follows:

> The [t]rial [c]ourt cannot imagine a more appropriate case to exercise its equitable power to award pre-judgment interest to Ciampa. This matter has languished [for] years because of [Appellants'] dilatory conduct, especially their continued lack of cooperation with the [c]ourt-[a]ppointed [r]eceiver and [f]orensic [a]ccountant regarding document production. Eleven years [have] passed since the [t]rial [c]ourt rendered its verdict in this matter. By their own design, [Appellants] had the benefit of time not to pay damages to Ciampa. Therefore, the [t]rial [c]ourt is compelled to use the most effective tool to right the injustice perpetrated by [Appellants], the award of pre-judgment interest to Ciampa.

T.C.O. at 82.

Appellants argue that the trial court award must be vacated because the trial court did not specify its method for calculating the amount of pre-judgment interest. It identified neither the rate of interest nor whether it was simple or compound. Brief for Appellants at 68. Appellants also argue that the award was inequitable because it was imposed upon Appellants "first for mounting a strenuous defense, and second for innocently failing to satisfy the [court-appointed forensic accountant's] inarticulate requests for information." ***Id.***

Appellants offer no case law for the latter proposition. They also do not direct this Court's attention to any evidence of record supporting their

characterization of their various failures to satisfy requests for information, including for data that they failed to provide Barsz and Pund, but nonetheless managed to locate and provide to Vallen, their own expert forensic accountant. When a party provides this Court with only minimal legal argument and makes assertions about the record that it does not support with a citation to where in the record such claims may be substantiated, the issue may be deemed waived for purposes of appeal. **See** Pa.R.C.P. 2119(a); **Wirth v. Commonwealth**, 95 A.3d 822 (Pa. 2014) ("Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived. It is not the obligation of an appellate court to formulate appellant's arguments for him.").

Moreover, even if Appellants provided sufficient argument to warrant our review, it is unlikely that they would prevail. Applying a compound six-percent interest rate[21] to the core verdict of $2,301,642 over the four-year period specified by the trial court results in pre-judgment interest of

_____

[21] The legal rate of interest that applies to, *e.g.*, contract cases in which the contract does not specify otherwise is six percent. **See** 41 P.S. § 202. Section 202 does not specify whether the interest is simple or compound.

$604,128, only modestly less than the $621,416.34 that the trial court awarded.[22]

Our case law suggests that interest as an element of damages should be determined equitably where it is not compelled by contract or statute. In **Smith v. Mitchell**, 616 A.2d 17 (Pa. Super. 1992), we noted that "in equity cases, the award and rate of interest allowed is at the discretion of the chancellor." **Id.** at 21; **see id.** (citing cases endorsing various methods of calculating interest other than statutory interest). Similarly, our Supreme Court quoted and adopted this Court's ruling in **McDermott v. McDermott**, 196 A. 889 (Pa. Super. 1938), as follows:

> An examination of the cases dealing with the charge and allowance of interest will disclose many difficulties, but the decided trend of courts of law and courts of equity has been to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case. . . . Unless a case be found, which is conclusive precedent, the safest and at the same time the fairest way for a court is to decide questions pertaining to interest according to a plain and simple consideration of justice and fair dealing.

**Murray Hill Estates, Inc., v. Bastin**, 276 A.2d 542, 545 (Pa. 1971) (quoting **McDermott**, 196 A. at 890) (minor modifications for clarity). In its opinion, the trial court spoke quite strongly in defense of its imposition of prejudgment interest. **See** T.C.O. at 82. And while it did not specify the

---

[22] Simple interest applied to the same verdict over the same term would be $552,394.06.

formula that it applied to arrive at the interest it imposed, our review confirms that the final award barely exceeded the statutory rate compounded annually. In light of the trial court's assessment of the conduct that prompted it to award prejudgment interest, which is not unjustified in light of the record, and given the absence of any case law cited by Appellants that is clearly to the contrary, we would not conclude that the award was so inequitable as to require reversal.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/8/2015